A.               S. M. G. M. L. E. M. J. J. M. G. M. R. O. K.               G. M. J. M. R. O. M. G. M. G. M. R. O. J. M. M. R. O. J.   R.  M. G. M. J. M. R. O. M. G. M. R. O. M. A. R. O. M. G. M. A.    A. G.          M. J. R. M. A. R. O. M. M. G. M. M. G. M. H.   P.        G. H. M. G. J. H. M. O. M. A. R. O. M. M. H. R. O. M. M. O.    R. O. M. G.  H.  H.   M. M. A. R. O. M. S. H. R. O. M. M. O. M. M. S. H.  O. M. S. H. M. R. O. M. M. A. R. O. M. M. H. M. O. M. M. O. M. O. M. M. O. M.    H. M. O. M.   M.  O. M. M. H. M. O. M. M. A. R. O. M. R. O. M. O. M. R. 2. R. 2 O. M. R. E. H.      R. H. M. O. M. M. H. P. H. M. M. M. L. O. N. P. R. R.  R. O. M. H. M. A M. R. E. H. O. M. H. M. R. O. M. H. O. M. L. M. O. S. W. M. L. R.      O. M. O. N. M. H. M. O. R. R. O. R. E. A. T.   M.  R.   H.   O.  O.  M. H. M. O. R. O. M. O. R. E. L. M. M. M. R.   H. O.   M. H. M. O. M.   M. O. R. E. L. M. M. M. M. R. E. L. M. M. R. H.  E.   K. R. P.   M. S. S. J. P. L. J. Q. R. M. M. O. L. M. M. O. N. M. O. Q.  P.      M. O. L. M. O. N. M. Q. R. P. L. M. O. N. M. Q. R. P. L. M. O. N. M. O.   Q. R. P. L. M. O.  M. O.  M. Q. R. P. L. M. O. N. M. Q. R. P. L. M. O.        P. L. M. O.    R. P. L. M. O. N. M. Q. R. P. L. M. Q. R. Q. R.           Q.   R. Q. O. M. O. S. Q. R. O. R. O. Y. Q. R. O.  O. S. Q. R.    O. S. Q. R. O.  O. S. Q. R. O. O. Q. R. R. O. O. O. R. O. O. R. O. A. Q. O. Q. R.     Q. R. O. Q. O. Q. O. Q. O. Q. R. O. Q. O. Q. R. O. Q.   Q. O. Q.          Q. O. Q. R. O. Q. A. Q. R. O. O. Q. O. Q. R.  O. Q. C.     Q.  Q.  O.  U. Q. R. Q. A. Q. O. Q. A. R. R. Q. O. Q. U. Q. A. R. Q. O.     O. Q. O. Q. O. Q. A. R. R. R. O. Q. O. Q. Q. T. Q. R. O. R. Q. O. Q. R.      Q. Q. O. R. Q. O. Q. R. Q. R. Q. R. Q. O.    Q.  Q.  Q.      Q. Q. O. V. O. Q. R. Q. R. Q. Q. O. R. Q. R. Q. R.  O.  V.   Q.   Q. H. I. achu P. Q. N. honor. T. A. T. I. A. Q.   A. Q. N. honor. I would definitely like to address this question, but I'd like to be sort of quick on the service issue. I think we have some substantive points we'd like to make, but on the service issue, I don't believe we have... Oh, but that's pretty determinative. If we were to hold that there was no service... Is it a threshold issue? ...it probably gets thrown out because of the statute of limitations. I would agree, and I will answer that question. I just think we have some merits to our substantive case. Okay. So you're going to tell us what you... However, I don't believe we've waived the service under Rule 12H. It requires either that the affirmative defense be raised in the answer or raised in a motion to dismiss. So it's an either-or situation. Well, that's the rule in order to preserve it at some point. Right. But then when you don't affirmatively say, yo, we should be out of here... In fact, when you say to the contrary, there are no other issues... No issues. In December, you said no other issues, and you wait until July when you file a summary judgment. Oh, by the way...    Okay. So you're going to tell us what you... However, I don't believe we've waived the service under Rule 12H. Well, then you're going into discovery. Then you're really far afield. It was a discovery status letter. We raised the issue on the next motion stage. The rule doesn't require a motion to dismiss. So therefore, the next procedural step is you get through discovery, and you get to... Well, doesn't that invite a real problem?         In fact, when you don't affirmatively say, yo, we should be out of here... What lawyers will do is insert a boilerplate SOP, service of process objection in their answer, lay in the weeds, engage in discovery, represent that there are no other issues for the Court's attention, and then after the statute of limitations is run, pop up with a motion for summary judgment and say they're gone. And that's in effect what your opponent is saying is what happened here. And the cases we gave you in that letter seem to indicate that yeah, that's problematic. So why don't you speak to those cases? How do you get around those cases which seem to say parties don't get to do that and 12H isn't a cover for them to do it? Well, respectfully, Your Honor, to get to the cases, the cases sort of presented a continuum. There were certainly cases that were about equivalent to ours, but then there were other cases that worked far, much further along that continuum. I would like to say, however, that we did raise it not only once, but service was really our answer. And generally, a plaintiff's lawyer generally comes back with a set of interrogatories that asks you to explain your affirmative defenses. We saw no such interrogatories in this case. Yeah. But you did, I mean, it's unrebutted, right, that you were fully engaged in the litigation of this case substantively and made no further attempt to disengage or even alert the other to the existence of an objection to personal jurisdiction until after the statute of limitations had run. Is that right? Well, Your Honor, this case was still filed in time. Essentially, the correct parties were named. The statute of limitations would not be. My question, though, is that factual recitation I just gave you is correct, isn't it? I believe that's correct. However, if he had served even on the day before summary judgment, despite the statute of limitations, the lawsuit was still filed timely. You know, we weren't playing a trick there. But if we throw it out for lack of personal jurisdiction, the case is gone and then would have to be refiled after the statute. Well, that is true, Your Honor. Yeah. However, he did have 14 months to serve. We never got an interrogatory about the issue. But I mean, I think we're aware that boilerplate, you know, affirmative defenses are just, you throw the laundry list. Let me ask you about qualified immunity. How did Judge Stark find so easily that there was no clearly established that the qualified immunity would be granted to all these defendants when there really is ADA law that prisoners are entitled under federal statute to accommodation over deafness? Let me just say, Your Honor, my opponent sort of goes back and forth between Eighth Amendment and ADA. And I would just like to say sort of as a preliminary matter, there's really nothing in the record that supports an Eighth Amendment violation. The damages here were his client did not get, the plaintiff didn't get to talk to his grandmother as often as he wanted. And he was put in solitary confinement for 15 days. After disciplinary hearing that he couldn't hear because they had him in his cell and he can't hear anyway. And he couldn't explain his side of the story. Respectfully, that's not true, Your Honor. If you look at the disciplinary proceedings, his story was recorded in the disciplinary write-ups. Yeah, but he couldn't hear the testimony, right? I mean, isn't there just like a fundamental problem with not providing an interpreter to a deaf person at a disciplinary hearing where you're about to give them sanctions and put them in solitary? Well, Your Honor, under cases like Sandin, the level of procedural due process required for inmate hearings is particularly low. He was only putting your best argument that deaf people don't get to participate.  He did participate, Your Honor. He told his side of the story. Due process gives you an opportunity to present your side of the story and be heard. And he said, I was fighting and it wasn't my fault. But you can't hear what's being said on the other side and there's no interpreter. That's, you know, it's like half a loaf. Implicitly, don't you think due process also includes the right to hear? I mean, to be heard, sure, but to hear and know what's going on in the hearing. So if you're hearing impaired, doesn't it imply that you've got to have the tools to be able to participate meaningfully? Well, Your Honor, the plaintiff was given a written notice of the charges against him. So all of those charges were presented in writing. Wow. Okay. I'm a little surprised that that's where you want to plant your flag. But to be honest, I haven't sat in on an inmate disciplinary hearing, but I understand that they're a very cut and dry matter. It's just the charges are there. The inmate gets a chance to respond and a decision is made. But presumably there's some testimony and there's charges and then there's testimony and his ability to respond to something that he hasn't heard would be pretty tough. Respond implies that you know what was said in the first place. But the district court got the burden of proof here on qualified immunity wrong, didn't it? It said that the defendant that, quote, Valdez failed to deduce evidence from which it could be concluded that his rights were clearly established. Isn't the burden on you as the state and not on Valdez to establish what is and isn't clearly established? I mean, you've got the burden to get the protection of qualified immunity. Am I wrong about that? Who's the burden on? Well, I think the problem is regardless of who the burden is on, there is no clearly established right to. But we're reviewing what the district court did. So I guess I need to know in the first instance, was the district court in error in putting the burden on Valdez to show that his rights were clearly established? Or was the burden on you as the state to show that reasonable officials could not have known that their conduct constituted a violation? Well, Your Honor, I believe that qualified immunity is an affirmative defense that we have to raise. But it's also to get around it is a substantive. There's a substantive portion of it, and it is affirmative. But it's kind of a yes or no. Is the district court right or wrong in putting the burden on Valdez? I believe the district court was correct because in order to present his case, it's a burden of proof that he would have to meet that these people did in fact know. But if there's an affirmative defense, you have to prove that, don't you? Well, Your Honor, I think there's an issue of oftentimes the substantive areas get sort of intertwined with the qualified immunity. In fact, even in these cases, the personal involvement issue is sometimes framed as a qualified immunity issue. Sometimes it's framed as a substantive issue. Well, there's not any confusion. I mean, I'm not confused about this. You've got qualified immunity. If you can prove you have qualified immunity, it's an affirmative defense. You've got the burden of proof. What's confusing about that? Well, I believe that it's evident that this is just not a clearly established law against, certainly not against state individual actors to the extent that Chisholm. Who had the responsibility of showing that? Did he have the responsibility to show that it is clearly established? Well, it's sort of hard to argue in the vacuum of this doesn't exist. So we present forward that there's no issue. There's no established authority that individual defendants can be held personally liable for this, which is a very disturbing thing to do for correctional, senior correctional. At what point do they become personal liable? Do we have to get the qualified immunity if there's no personal involvement? I don't believe under Ashcroft v. Iqbal that's necessary. Ashcroft v. Iqbal certainly has reiterated that they must be a moving force. Not only that, but it requires personal knowledge and acquiescence, which I believe is a little tweak from Sample, although I don't know that I believe even the sample analysis works for us in this case, because in Sample there were ongoing over-detention issues, which at least under a constructive knowledge theory would work. There's certainly no evidence in the record here that would put defendants on a constructive knowledge theory that there's a problem going on. How about the grievances that were filed? Certainly that would have put them on notice, would it not? Respectfully, Your Honor, no, it would not. The grievances go through a grievance process that go up to a grievance chair. Just because an inmate is filing grievances, which many of them do, doesn't mean it comes up to the warden level. So none of these individuals you're saying, Danberg, Phelps, Klein, really were involved in that process? There was very little. Only at the very last moment did a letter go to the warden, and the warden delegated that letter to his chief counselor, Mr. Hosterman, and by all accounts in the record, that issue was dealt with. If you were the commissioner or you were a warden, you wouldn't go follow up if the record suggested that the issue was signed off and resolved. Did he note, was there an awareness that it had been signed off and resolved? It was listed on the grievance. The grievance came back as signed off, as resolved. So if he did go check in, we have a system called DAX. It's a tracking system.  I don't think a reasonable manager would have a duty to go any further than that. All right. Anything else? I mean, I would just conclude, in conclusion, I would just say there's absolutely nothing in the record to suggest that Mr. Valdez was subjected to any kind of cruel and unusual punishment under the Eighth Amendment, which is the theory that's in the complaint. Perhaps there's due process, but that wasn't really the cause of action that Mr. Martin just presented. And I don't believe that Chisholm creates a right that can be held against individual actors. It would be very disturbing for this court to impose ADA liability on individual managers. The ADA is written to apply to the state for a reason. As managers, my clients have to manage a budget, which is given to them by the General Assembly. If they don't have the ability to provide necessary things for the disabled, the correct remedy should be to hit the state, to hit the state coffers, not to hit individual people. I mean, this is also a slippery slope. At what point would an individual manager become personally liable? Mr. Danburg was, he was two years in, but the Corrections Department is a large department, and if you believe what many of our adversaries say, it had a history of, it's a difficult to manage department. But Dr. Fee, Chisholm involved a 1983 suit against individuals, did it not? No, Your Honor, I believe Chisholm was an ADA suit. Well, it's pled with under 1983 as well. All right, we'll sort through that. Thank you. If there's nothing else, I'll conclude. All right, thank you. Mr. Martin, you reserved? Yes, Judge Rendell, you were right. It was against individuals, probably as well as the department. It was a 1983 action. This case that was decided by Judge Roth. With regard to the personal involvement issue, when I was questioned earlier, I think the questioning really related strictly to one of the four defendants, Carl Danburg, the Commissioner of Correction. I think we have some rather strong evidence that links in a personal involvement way the other three defendants, the warden of the prison, Mr. Phelps, as well as Deputy Wardens Kline and Pierce. And what I'm referring to specifically is a letter that Mr. Connell just acknowledged. My client sent to the warden addressed as a final notice sometime around October 5th, 2009, which was roughly halfway through his incarceration period. The letter was sent directly to the warden's office. Warden said, you know, please handle, and he CC'd the two deputy wardens. Where is that letter? Is this considered a grievance, I guess, according to the system? It was treated as such, Your Honor. But, you know, it raised some very disturbing issues. And this, by the way, is found in JA-192. But it really talked about the fact that he had been denied accommodations for the first, for his entire stay up until October. And, you know, whether they handled it as a grievance or not, they were certainly on knowledge that they had knowledge. So what's wrong with please handle? What's wrong with please handle? How does that show, how does that make him liable? Well, and actually, to be fair, the please handle was to this Ron Hosterman, who was the treatment coordinator. But then the grievance was filed two days later, correct? Yes, that's correct. And was handled? Well, it was handled by Mr. Hosterman. Right. Which allowed him the use of the TTY on one occasion. Sure. Now, whether that's right or wrong, the question is, should the warden have done more? If the warden gives the information, which appears to be in the nature of a grievance, to the person who's responsible for handling these kind of grievances and says, please handle, address this, and in fact that happens, how does that show that the warden is a moving force behind a deprivation? Your Honor, this letter was written directly to the warden. And it talked about the fact that my client was deaf and that he has not had any phone calls. Sure. But you're not suggesting, are you, that prisoners can jump the grievance system and create substantive rights for themselves simply by writing to the warden, are you? No, I'm not, Your Honor. But this certainly should have put him on notice. I believe, as in Mr. Danburg, I think he should have been on notice already because they freely acknowledged, and I must say with callous indifference in their deposition testimony, hey, we don't have any type of policies for deaf people. If we treated them differently, we would be discriminating against the general population. Let's stick with what you've alleged and we're dealing with here, which is the idea that the warden is on notice and therefore should have done something. And in this case, he does do something. He passes this on to somebody who's responsible for handling it. And I'm trying to chase down the theory you've got, Mr. Martin, for why that is not only not enough, but it actually represents a sort of a moving force behind deprivations that constitute cruel and unusual punishment. The warden, in this case, Warden Phelps, was the chief administrator of the Vaughan prison. And he was put on direct notice that he had a prisoner who was not getting any accommodations for his hearing impairment. It's easy to delegate, Your Honor. As a chief administrator, it's easy to delegate. But he was put on specific notice by Mr. Valdez. Not only easy to delegate, perhaps, but essential to delegate, right? Because the warden can't be addressing each individual prisoner's grievances if they choose to write them. He's got to give it back within the system that's set up. He does that. And evidently, somebody tells him or lists in the system it's addressed, it's been handled. What's the flaw in the way he handled that? If I may, Your Honor, I don't believe that this particular document, and Judge Randall pointed out that there was a grievance that was filed a couple days later. But this particular document doesn't say it was handled. Rather, it just says, essentially, hey, Ron, you deal with this. I don't want to deal with this. But then the grievance was handled. I mean, it would be a different situation if Valdez had not signed off on his grievance and had persisted and said, what you're doing is wrong. This isn't just one thing. It's systemic. But we don't have that. We have something that actually was resolved. And if the warden checked it, would find that the prisoner was satisfied. What's a warden to do? Momentarily, Your Honor, because depositions make this very clear as well. This was a ticket for one telephone call. That was one telephone call, Your Honor. He was in for nine months. And then he filed another grievance. And he testified that he filed a lot more grievances that were produced in the record. He had great difficulty in contacting the staff. And he just was unable to communicate. All right. Thank you, Your Honors. Appreciate it. Thank you.